# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1087

_____

Phillip L. Rosemann,
                                             *

     Plaintiff - Appellant,          *

                                     *   Appeal from the United States

v.                                 *   District Court for the

                                     *   Eastern District of Missouri.

Roto-Die, Inc.,                 *

     Defendant - Appellee.      *

_____

Submitted:  September 12, 2001

Filed: January 9, 2002

_____

Before LOKEN, RICHARD S. ARNOLD, and FAGG, Circuit Judges.

_____

LOKEN, Circuit Judge.

Philip Rosemann is a minority shareholder of Roto-Die, Inc., a closely held corporation. He filed this diversity action to enforce a Stock Redemption Agreement, alleging that Roto-Die is obligated to purchase his shares of Roto-Die stock at their current fair market value. The district court granted summary judgment in favor of Roto-Die, concluding (i) that Rosemann's prior state court action under a Missouri statute that protects shareholders who object to mergers created a res judicata bar to this action, and (ii) that the Stock Redemption Agreement unambiguously established a purchase price of $9.75 per share, the stock's declared fair market value in 1978

when the Agreement was signed. Rosemann appeals these rulings. We conclude that res judicata does not bar claims under the Stock Redemption Agreement, and that the price term in the Agreement is ambiguous. Accordingly, we reverse and remand.

## I.  The Res Judicata Issue.

Roto-Die is a successful family-owned business that manufactures rotary dies. Before the Stock Redemption Agreement was signed in March 1978, Rosemann's father gave 2,000 shares of Roto-Die stock to Rosemann and to each of his three siblings, leaving the parents owning 17,000 of the 25,000 outstanding shares. By the mid-1980s, after additional gifts, the father and each sibling owned 5,000 shares. Beginning in 1986, family harmony evaporated. Rosemann's sister and one brother left the business and sold their 10,000 shares to Roto-Die; Rosemann alleges they received far more than $9.75 per share. After a falling out with his father and the remaining brother, Rosemann gave up his position as chief operating officer and became an inactive, disaffected minority shareholder. In late 1991, Roto-Die merged with Micrometrics Systems, a transaction that brought Melvin Stanley into Roto-Die's management and shareholder group. After the merger, Rosemann, his father, and his brother each owned 5,000 shares, or 26.14% of the Roto-Die stock. Stanley owned the remaining 21.57%. Rosemann's father has died; his 5,000 shares are now owned by a trust. Since the Micrometrics merger, Rosemann has filed four lawsuits as a Roto-Die minority shareholder, seeking to force the controlling shareholders to purchase his shares for their current fair market value, which he alleges to be in excess of $3,920 per share. The issue is whether any of the first three suits, which were filed in Missouri state courts, raises a res judicata bar to this suit.

The first state court lawsuit sought to enforce Rosemann's statutory right, as a shareholder objecting to the Micrometrics merger, to sell his shares to Roto-Die for their appraised fair value. See MO. REV. STAT. § 351.455. The state court rejected the claim because Rosemann initially voted in favor of the merger. See Rosemann

v. Roto-Die, Inc., 947 S.W.2d 507 (Mo. App. 1997). The district court concluded this suit created a res judicata bar to his claim under the Stock Redemption Agreement.

The second state court lawsuit asserted various claims to remedy the alleged oppression of Rosemann as a minority Roto-Die shareholder. The first nine counts sought relief consistent with his continuing role as minority shareholder (such as involuntary liquidation). Count X sought a declaratory judgment construing the Stock Redemption Agreement. However, Count X was dismissed without prejudice for lack of a justiciable controversy because Rosemann had made no demand under the Agreement that Roto-Die redeem his stock. Some time later, the remaining claims were dismissed without prejudice for failure to prosecute. The third state court lawsuit was a pro se re-filing of most of the second suit, *other than Count X*. When Rosemann voluntarily dismissed this case, the court ordered that the dismissal be with prejudice, no doubt because he had dismissed these claims without prejudice in a prior lawsuit. See Britton v. Hamilton, 740 S.W.2d 704, 705 (Mo. App. 1987).

In February 1999, following dismissal of the third state court action, Rosemann made a written demand that Roto-Die redeem twenty shares of his stock under the Stock Redemption Agreement. Roto-Die replied that the Agreement does not permit a shareholder to redeem less than all his shares. Rosemann then commenced this action, seeking damages for Roto-Die's refusal to redeem twenty shares at their current fair market value. The district court concluded this suit is barred by res judicata because Rosemann's claim under the Stock Redemption Agreement is merely a "variant theory" for the relief he sought in the first state court lawsuit -- redemption of his Roto-Die shares for their fair market value. We disagree.

We apply Missouri res judicata principles in determining whether this action is barred by any of Rosemann's prior state court lawsuits. See Harmon Indus., Inc. v. Browner, 191 F.3d 894, 902 (8th Cir. 1999). Rosemann did not assert a claim under the Stock Redemption Agreement in those lawsuits (except in Count X of the

second lawsuit, which was dismissed without prejudice). But the absence of such a claim is not dispositive because Missouri courts apply res judicata to bar a claimant from splitting a single cause of action. See St. Bethel Missionary Baptist Church, Inc. v. St. Louis Builders, Inc., 388 S.W.2d 776, 778 (Mo. 1965). Thus, we must determine whether the claim asserted under the Stock Redemption Agreement in this lawsuit is part of the same cause of action that was asserted in any claim litigated in the first or the third state court lawsuits. It is not always easy to define the boundaries of a single cause of action for this purpose:

> In general, the test for determining whether a cause of action is single and cannot be split is: 1) whether separate actions brought arise out of the same act, contract or transaction; 2) or whether the parties, subject matter and evidence necessary to sustain the claim are the same in both actions. The word "transaction" has a broad meaning. It has been defined as the aggregate of all the circumstances which constitute the foundation for a claim. It also includes all of the facts and circumstances out of which an injury arose.

King Gen. Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints. 821 S.W.2d 495, 501 (Mo. 1992), quoting Burke v. Doerflinger, 663 S.W.2d 405, 407 (Mo. App. 1983).

The district court concluded that the first state court lawsuit bars this action. In that lawsuit, Rosemann attempted to invoke his statutory rights as a dissenting shareholder following the Micrometrics merger. A shareholder who timely objects to a merger has a statutory right to be paid fair value for all his shares "as of the day prior to the date on which the vote was taken approving the merger or consolidation." MO. REV. STAT. § 351.455.1. If the dissenting shareholder and the surviving corporation do not agree on a purchase price, the shareholder may bring an action to recover his shares' fair value as determined by the court. See § 351.455.3. This

-4-

cause of action requires proof of the shareholder's timely objection to a specific merger transaction, and proof of fair value on a specific date.

By contrast, a claim under the Roto-Die Stock Redemption Agreement is not triggered by or limited to a specific corporate transaction or time period. As this dispute illustrates, depending on how the Agreement is interpreted, such a claim may or may not require sale of all the shareholder's stock, and may or may not require proof of current fair market value. Rosemann could have asserted his statutory rights as a dissenting shareholder and his contractual rights under the Stock Redemption Agreement as alternative bases to redeem his Roto-Die shares for their fair market value after the Micrometrics merger. But we cannot agree that a contract claim under the Agreement was "merely a variant theory" to his statutory cause of action under MO. REV. STAT. § 351.455.

One obvious reason why these claims are not part of a single cause of action is that Rosemann made no demand under the Stock Redemption Agreement prior to filing the first lawsuit. In general, res judicata does not bar claims that did not arise until after the first suit was filed. See WEA Crestwood Plaza, L.L.C. v. Flamers Charburgers, Inc., 24 S.W.3d 1, 9 (Mo. App. 2000); Baker Group, L.C., v. Burlington N. and Santa Fe Ry. Co., 228 F.3d 883, 886 (8th Cir. 2000). Roto-Die responds that Rosemann could easily have made a demand under the Stock Redemption Agreement before filing the first lawsuit and then joined his claim under the Agreement with his dissenting shareholder statutory claim. But res judicata does not extend as far as the rules of permissive joinder. The question is whether the two claims are a single cause of action. We think not. One arose out of a 1978 contract; the other out of a 1991 merger. One requires proof of Rosemann's rights under a private contract; the other proof of his rights under a Missouri statute.

Moreover, we think the district court's application of res judicata is contrary to the purpose underlying § 351.455. The statute is intended to protect dissenting

-5-

shareholders from being injured by transactions over which they have no control. It would be exceedingly harsh to hold that a minority shareholder who elects to bring an action under § 351.455.3 must either assert -- or forever forfeit -- his claims under a pre-existing shareholders' agreement. A shareholder who objects to a merger may be willing to redeem his shares for the price established in the statute, but not for a lesser price if that is what he would receive under a shareholders' agreement. Here, for example, Rosemann was concerned that a court would construe the Stock Redemption Agreement as freezing the redemption price at $9.75 per share. Thus, immediately following the Micrometrics merger, he was willing to sell his shares at the "fair value" prescribed in the statute, but unwilling to risk an unfavorable redemption price under the Agreement. In our view, the doctrine of res judicata did not compel him to exercise these disparate rights in a single lawsuit.

Alternatively, Roto-Die argues that the second and third state court lawsuits create a res judicata bar. This contention is without merit. Count X of the second suit did assert a claim under the Stock Redemption Agreement, but that count was dismissed without prejudice for lack of a justiciable controversy. This non-final disposition did not create a res judicata bar. The third lawsuit resulted in a dismissal with prejudice, but it involved only minority shareholder claims premised upon Rosemann remaining a minority shareholder. Roto-Die notes that Rosemann could have added a claim under the Stock Redemption Agreement in the third lawsuit, and cured the defect in Count X of the second lawsuit by demanding that Roto-Die redeem his shares. But again, this would have been the permissive joinder of a distinct cause of action. Res judicata does not bar the present action because Rosemann elected not to assert his contract rights in the previous lawsuits.

No court has entered a final judgment construing Rosemann's rights under the Stock Redemption Agreement. Instead, a state court in the second lawsuit ruled that Rosemann must demand redemption under the Agreement to make the parties' contract dispute justiciable. Rosemann first made a demand in February 1999, after

the three state court lawsuits. Though his constant objective has been to sell his minority interest for its current fair market value, his claim under the Stock Redemption Agreement is a cause of action distinct from his prior statutory and common law claims as a disaffected minority shareholder. Therefore, res judicata and the rule against splitting a claim do not bar this action.

## II. Construing the Stock Redemption Agreement.

The Stock Redemption Agreement was signed by six Rosemann family members who owned the Roto-Die shares outstanding in March 1978. The Agreement prohibited the shareholders from disposing of their shares, except to the corporation. The district court concluded that the following paragraphs unambiguously establish that Rosemann is entitled to receive only $9.75 per share if he redeems shares under the Agreement:

> 2. The outstanding capital stock of the Company consists of 25,000 shares which are owned and held by the Stockholders as follows:

> | | |
> |---|---|
> | [Rosemann's father] | 16,980 shares |
> | [Rosemann's mother] | 200 shares |
> | [Rosemann's brother] | 2,000 shares |
> | Phillip L. Rosemann | 2,000 shares |
> | [Rosemann's sister] | 2,000 shares |
> | [Rosemann's brother] | 2,000 shares |

> The value of each share of stock of the Company held by each Stockholder shall be $9.75, which is the fair market value at the date of the agreement.

> \* \* \* \* \*

> 5. If during the lifetime of any Shareholder, said Shareholder desires to sell any or all of his shares of stock, he shall notify the

-7-

company in writing and then the Company shall purchase all of said shares of the selling shareholder at the price above set forth under the following terms and condition. . . .[1]

In the district court's view, the term "the price above set forth" in paragraph 5 was an unambiguous reference to the $9.75 value term in paragraph 2, and the Agreement contained no provision for "adjusting the $9.75 price upward for changes in fair market value." Rosemann argues the contract is ambiguous in this respect.

Under Missouri law, which governs this issue, the determination of whether a contract is ambiguous is an issue of law we review de novo. Sligo, Inc. v. Nevois, 84 F.3d 1014, 1019 (8th Cir. 1996). To determine whether contract language is ambiguous, "we look at the context of the entire agreement and determine if the language, given its plain and ordinary meaning as understood by a reasonable person, is reasonably susceptible to more than one construction." Jackson v. Christian Salvesen Holdings, Inc., 978 S.W.2d 377, 383 (Mo. App. 1998). The determination is made from the four corners of the contract; we "cannot use extrinsic or parol evidence to create ambiguity." Lake Cable, Inc. v. Trittler, Jr., 914 S.W.2d 431, 436 (Mo. App. 1996). If the contract is fairly susceptible of at least two reasonable interpretations, "summary judgment is inappropriate because extrinsic evidence is [then] admissible to show the intent of the contracting parties." Boatmen's First Nat'l Bank of Kansas City v. P.P.C., Inc., 927 F.2d 394, 396 (8th Cir. 1991).

While the district court's interpretation of the Stock Redemption Agreement is certainly plausible, we cannot agree it is the only reasonable interpretation of Roto-Die's redemption obligation. Paragraph 5 of the Agreement obligates Roto-Die to redeem shares "at the price above set forth" whenever a shareholder desires to sell. But the contract contains no "price above set forth." Instead, Paragraph 2 declares

---

[1]The remainder of paragraph 5 consisted of deferred payment terms designed to prevent Roto-Die's redemption obligations from adversely affecting the company.

"the fair market value at the date of the agreement," $9.75. In most contexts, "value" does not mean "price." Though fair market value is often used to define a flexible price term, it seems highly unlikely, though not beyond reason,[2] that the declared "value" on a particular date would be used as the inflexible purchase price for transactions far in the future. Thus, as a textual matter, it seems as reasonable to conclude that the Stock Redemption Agreement inadvertently neglected to include a flexible price term, as to conclude that the Roto-Die shareholders intended to forever limit themselves to receiving $9.75 per share when they died or desired to redeem their shares under paragraph 5. Moreover, Paragraph 3 of the Agreement, which requires the company to purchase a deceased shareholder's stock, provides: "The purchase price of such stock shall be in accordance with the provisions of this agreement." The reference to "provisions" in the plural seems like more than a simple incorporation of the $9.75 value provision in paragraph 2.

In addition to these textual problems, the district court's interpretation of the redemption price term is also inconsistent with the most likely purposes of the Stock Redemption Agreement. In 1978, Rosemann's father undoubtedly used inter vivos gifts of Roto-Die stock as an estate planning device.[3] The normal purposes of a shareholders' agreement in this type of situation would be to prevent the children from transferring gifted shares in the closely held family business to outsiders or

---

[2]In Sligo, we concluded that a Restrictive Stock Transfer Agreement unambiguously fixed the future purchase price at one and one-half times book value on a specified date. However, the book value reference appeared in a section of the agreement that was clearly intended to establish the price term, and our construction was consistent with the remaining provisions of the agreement. See 84 F.3d at 1016, 1021. Here, the Stock Redemption Agreement has no clear price term.

[3]If accepted by the Internal Revenue Service, pegging the March 1978 fair market value of Roto-Die stock at $9.75 per share meant that 1978 gifts of 2,000 shares to each child would be just under the parents' combined maximum gift tax exclusions of $20,000 per donee. See 26 U.S.C. § 2503(b).

creditors, while leaving them the ability to obtain value for their shares through redemption in specified situations. If the Stock Redemption Agreement froze the redemption price at the initial value of the shares, as the district court concluded, Rosemann's father denied his children any future appreciation in the value of the business. That seems both contrary to typical parental desires and undesirable from an estate planning perspective. In these circumstances, extrinsic evidence probing the intent of the contracting parties is needed.

In August 1988, the Roto-Die shareholders entered into an agreement which released the shares owned by Rosemann's father but otherwise "ratif[ied], confirm[ed], and republish[ed] the [Stock Redemption] Agreement in its entirety." Roto-Die argues this later agreement confirms that $9.75 was intended to be a permanent stock redemption price. Although several contemporaneous instruments may be read together as one contract,[4] Roto-Die cites no authority for its implied argument that a subsequent contract is not extrinsic evidence and therefore may be considered in determining whether an initial contract is ambiguous. But even if this later agreement may be considered, we fail to see how it cures any ambiguity in the initial Stock Redemption Agreement. The later agreement may mean that Rosemann's father always knew what he intended to accomplish. But that does not support the grant of summary judgment on the issue of an ambiguity.

Finally, Roto-Die contends that Rosemann's prior admissions regarding the Stock Redemption Agreement entitle Roto-Die to judgment as a matter of law even if the contract is ambiguous. We disagree. In various pleadings and deposition testimony in the state court lawsuits, Rosemann acknowledged that the Agreement could be construed as permanently freezing the redemption price at $9.75 per share, to his great financial disadvantage. But he consistently stated his disagreement with such an interpretation. Therefore, these so-called admissions fall far short of

---

[4]Ringstreet Northcrest, Inc. v. Bisanz, 890 S.W.2d 713, 718 (Mo. App. 1995).

providing grounds for a judicial estoppel or any other basis for precluding his claims in this lawsuit.

For the foregoing reasons, we conclude that res judicata does not bar this lawsuit and that the Stock Redemption Agreement is ambiguous with regard to the price at which Roto-Die must redeem Rosemann's shares. The judgment of the district court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.